ATKIN & SHIELDS, P.C.
JOANN SHIELDS (4664)
BLAKE ATKIN (4466)
136 South Main Street, Sixth Floor
Salt Lake City, UT  84101
Telephone:  801/533-0300
801/533-0380 (fax)

Liaison Counsel

[Additional counsel appear on signature page.]

RECEIVED CLERK
FILED
2004 OCT 30  A 12: 05
U.S. DISTRICT COURT
DISTRICT OF UTAH

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MDL 1546 IN RE MEDICAL WASTE SERVICES ANTITRUST LITIGATION | AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |
| This Document Relates To: | 2:03MD1546 DAK |
| ALL ACTIONS. | The Honorable Dale A. Kimball |

135

Plaintiff, on behalf of itself and all others similarly situated, alleges the following facts and claims upon knowledge as to matters relating to itself, and upon information and belief as to all other matters:

## INTRODUCTION

1.  Plaintiff brings this action for damages and injunctive relief against Stericycle, Inc. ("Stericycle"), which has monopolized the market for the collection, transport and lawful disposal of medical waste products ("Medical Waste Services") charged to Plaintiff and other customers in the state of California, from the date four years prior to the filing of this action to the present (the "Class Period"). The acts of Defendant as alleged in this Complaint constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. §2, Section 7 of the Clayton Act, 15 U.S.C. §18, and the California Business and Professions Code §§17200, *et seq.* Furthermore, as a result of the acts alleged herein, Stericycle has been unjustly enriched.

2.  Medical waste includes a range of sensitive material, including biomedical, biohazardous, chemotherapeutic, and other similar waste found in syringes, blood products, pharmaceuticals, and surgical products. To protect patients, doctors, the public and the environment federal, state, and/or local laws require treatment and disposal of these waste products by specialized means. A significant percentage of medical waste can be treated by steam sterilization or microwave, but several categories of medical waste by law must be incinerated. The nationwide market for Medical Waste Services is estimated at $1.5 billion.

3.  Since it was incorporated in 1989, Stericycle has pursued a nationwide strategy of buying out competitors in Medical Waste Services to achieve and enjoy monopoly profits. As a key tactic in its monopolization efforts, Stericycle has bought out competitors with operating incinerators. Its largest acquisition was that of BFI Waste Systems of North America, Inc. ("BFI"),

in November 1999.  In December 2001, Stericycle bought out its last remaining competitor who owned and operated an incinerator in California, Integrated Environmental Systems, Inc. ("IES"). Since that time, Stericycle has required competitors who provide hauling services to transport medical waste to Stericycle's incinerators in Utah and Arizona (the Arizona incinerator closed in March 2003).  This strategy has allowed Stericycle to monopolize the market for Medical Waste Services, increasing its prices for collection, treatment and disposal to supracompetitive levels. Some customers have suffered price increases of more than 300 percent.  Moreover, Stericycle charges haulers who deliver to Stericycle's incinerators more in incineration costs than it charges its own customers for collection and incineration combined.

4.      During the Class Period, Defendant engaged in illegal anticompetitive conduct by, inter alia, acquiring its main competitor in California, BFI, and its only competitor in the provision of incinerator services, IES, and then using that position to monopolize the Medical Waste Services market, charging supracompetitive prices for inferior services, to the detriment of Plaintiff and the Class (defined below).  Plaintiff requests treble damages for this anticompetitive behavior under the Sherman and Clayton Acts, and in the alternative, disgorgement of the unjust enrichment that Stericycle obtained through its monopolistic activities.

## PARTIES

5.      Plaintiff David M. Stoll, M.D. is a physician's office in Beverly Hills, California, which directly purchased Medical Waste Services from Defendant Stericycle during the Class Period, and paid supracompetitive prices during the Class Period, due to the illegal anticompetitive conduct by Defendant, alleged herein.

6.      Defendant Stericycle, Inc, is a Delaware corporation, with its principal place of business in Deerfeld, Illinois.  Stericycle operates throughout North America, providing Medical

Waste Services to commercial and governmental customers.  As alleged herein, during the Class

Period, Stericycle has monopolized, and/or attempted to monopolize, Medical Waste Services in the

state of California, through its acquisitions and business practices.  During the Class Period,

Stericycle has operated medical waste incinerators in Chandler, Arizona (closed in 2003), and North

Salt Lake, Utah, which it has used to service the California market.  Stericycle now controls the

disposal services for 89 percent of all medical waste produced in the United States.

### JURISDICTION AND VENUE

7.      This action arises under Section 2 of the Sherman Act, 15 U.S.C. §2, and Sections 7

and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26.

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337(a)

and 15 U.S.C. §26.  The Court has supplemental jurisdiction over the California state law claim

pursuant to 28 U.S.C. § 1367.

9.      Defendant is located in, has transacted business, and has engaged in the activities

complained of in the District of Utah.

10.     Venue is proper in this judicial district pursuant to 15 U.S.C. §22 and 28 U.S.C. §

1391 (b) and (c), because Defendant does and has done business in this judicial district.

11.     During the Class Period, the conduct of Defendant has taken place in and affected the

interstate trade and commerce of the United States.

12.     The conduct of Defendant has directly, substantially and foreseeably restrained trade

and commerce.  Medical Waste Services are sold in interstate commerce.

### RELEVANT MARKET

13.     To the extent applicable to the claims alleged herein, the Relevant Product Market is

the market for Medical Waste Services.

14.   The Relevant Geographic Market encompasses the state of California.

15.   During the Class Period, Defendant acquired and possessed a monopoly market share of the Relevant Product Market in California. The amount of Medical Waste generated annually in California has been estimated at 168,840 tons per year.

## FACTS

16.   Medical waste comprises a variety of sensitive materials that must be treated before they can be released into the environment. To protect patients, doctors, the public, and the environment federal, state, and/or local laws require disposal of these waste products by specialized means. If released into the environment without proper treatment, Medical Waste can cause infectious disease and other health hazards. A company wishing the provide incineration services must invest substantial amounts to create the physical facility, to hire and train the necessary staff, and to obtain a license and other forms of governmental permission to provide Medical Waste Services. The costs associated with providing Medical Waste Services, and specifically incineration, constitute high barriers to entry into the Relevant Product Market.

17.   A company wishing to provide hauling services will be both a competitor and a customer of Stericycle, as it must deliver incinerator-only waste to Stericycle's incinerator, and likely will deliver other medical waste to one of Stericycle's autoclaves. A competitor must offer competitive pricing on collection and transport, and also must pay Stericycle's supracompetitive prices for incineration.

### Stericycle's California Acquisitions

18.   Since 1989, when it was founded with venture capital seed money, Stericycle has pursued a corporate mission of becoming a nationwide Medical Waste Services provider through the acquisition of competitors.

19.     In June 1995, Stericycle made its first acquisition in the California market (known to Plaintiff at this time), that of Safetech Health Care ("Safetech"). Stericycle purchased the customer list and transportation equipment of Safetech for $160,000.

20.     In May 1996, Stericycle acquired Doctors Environmental Control, a Santa Ana-based company for which Stericycle paid about $1 million, in exchange for equipment, property and the company's customer list.

21.     In December 1996, Stericycle acquired a majority of the Medical Waste Services business of Waste Management, Inc. Stericycle acquired the customer accounts, customer contracts, trucks and other vehicles, and other associated assets from WMI at 24 locations, including those in California.

22.     Stericycle later acquired Environmental Transloading Services, Inc, of Los Angeles, in January 1999, purchasing the customer lists and other assets, the value of which was not disclosed. In July 1999, Stericycle acquired Ionization Research Company, Inc. which operated under the name of EcoSolutions, Inc. The aggregate purchase price of these acquisitions was not disclosed and was paid in a combination of cash, notes payable and common stock.

23.     In addition to purchasing companies outright, Stericycle has purchased the right of first refusal from Medical Waste Services companies who may entertain other buyout offers, in order to prevent any competitor from gaining a larger presence in the market for Medical Waste Services.

**Stericycle's Acquisition of BFI Medical Waste Services Business**

24.     In 1999, BFI was Stericycle's only remaining national competitor and the only integrated Medical Waste Services competitor in California. On November 12, 1999, Stericycle acquired BFI's Medical Waste Services business throughout the United States, including California (the "1999 Acquisition").

- 5 -

25.     Prior to the 1999 Acquisition, there had been competition in California between and among two vertically integrated competitors (Stericycle and BFI) and various non-integrated third-party medical waste haulers.  BFI competed with Stericycle for national accounts, new customers and third-party haulers. Thus, prior to the 1999 Acquisition, Stericycle's ability to raise prices within the Relevant Geographic Market was effectively constrained by (a) actual and threatened competition from BFI for medical waste customers, (b) BFI's willingness and ability to provide medical waste disposal services to third-party haulers within the Relevant Geographic Market, and (c) BFI's ownership and control of medical waste treatment and disposal facilities.  Stericycle eliminated each of these competitive constraints when it acquired BFI's Medical Waste Services operations with the 1999 Acquisition.

26.     The 1999 Acquisition had a profound and unlawful anti-competitive impact in California and elsewhere throughout the country.  As Stericycle itself touted shortly after the 1999 acquisition:

> With its recent acquisition of the medical waste business of [BFI], Stericycle is the only company offering medical waste services nationally.

27.     By acquiring BFI's medical waste operations in the U.S., Canada and Puerto Rico, Stericycle essentially tripled its customer base, adding over 200,000 BFI customers, and similarly tripled the number of Stericycle-controlled treatment facilities, from 12 to 37.  In California specifically, the market became substantially more concentrated, as Stericycle immediately eliminated the only vertically integrated competitor, acquiring that competitor's customers, equipment and facilities.  Thus, Stericycle's California customer base expanded from less than ten thousand to more than thirty thousand with the addition of BFI's customers; Stericycle acquired BFI treatment facilities, including facilities in Fresno, San Diego and Vernon, California, and; Stericycle acquired all of BFI's third-party hauler business.

- 6 -

28.     By eliminating its only national competitor and its only integrated competitor in California through the 1999 Acquisition, Stericycle achieved sufficient market concentration to obtain unlawful monopoly power and the unconstrained ability to raise prices and cut off services to medical waste customers and third-party haulers.

29.     Having achieved increased market concentration and monopoly power in the Relevant Geographic Market, Stericycle immediately after the 1999 Acquisition implemented a series of price gouging and other anti-competitive measures, including price increases and the imposition of new onerous contract terms and fees. In particular, Stericycle imposed three across-the-board price increases on California customers during 2000, less than one year after the 1999 Acquisition.  In responding to various government authorities investigating Stericycle's practices, Stericycle has admitted to raising its customers' prices by a staggering 38% on small quantity generators – who comprise the bulk of Stericycle's customers and generate the vast majority of Stericycle's revenues – within fifteen months of the 1999 Acquisition.

30.     In addition to the across the board price increases, in the months after the 1999 Acquisition Stericycle also increased fees and implemented new fees for its California customers, which had the effect of further raising prices.  In August 2000, for example, Stericycle increased its minimum pickup charge.  In September 2000, Stericycle imposed a new "Record Retention Fee." In his deposition, Stericycle Chief Operating Officer Richard Kogler identified a dizzying array of fees Stericycle imposes on its customers:

> a stop charge, which is the – he charge the customer incurs to have our truck stop to pick up anything; there can be charges relating to the number of containers we pick up once we stop, there can be charges relating to the supplies, for packaging that we provide; there can be some state-mandated fees ... and there is a record retention fee that we charge because we're responsible for maintaining the manifest, the shipping documents that verify that the waste that we picked up was properly taken to a treatment plant and ultimately disposed of ... [and there are also] minimum charges,

[which] would be similar to a stop charge, in that it's a minimum charge for us to stop and pick up whatever you have.

31.     After the 1999 Acquisition, Stericycle further unlawfully exercised its market power to saddle its customers with even longer term contracts, thereby erecting a significant barrier to entry for third-party haulers and other would-be competitors.  Before the 1999 Acquisition, Stericycle bound its customers to form service contracts with a three-year term.  Beginning in March 2000, Stericycle began to convert customers into new contracts containing a *five*-year term, with automatic five-year renewals and substantial penalties for early termination, as part of its "Steri-Safe" program. Stericycle sought to enforce the contractual penalty clauses through threatening letters sent to those customers who wished to discontinue medical waste services.

32.     Stericycle acknowledges (indeed, emphasized) in its communications with the financial markets that its standardized, long-term contracts -- which erect barriers to entry by potential competitors -- provide Stericycle with a competitive advantage.  For example, on its website Stericycle proclaims that it has achieved dominance in the market for Medical Waste Services through the use of long-term contracts with its customers, stating that "over 95% of [its] revenues are under long-term contacts with automatic renewal," that these "contracts generally include pass through price increase provisions" and that the long-term contracts result in "[h]igh customer revenue retention: exceeding 95%."  Stericycle's ability to bind new and existing customers to these onerous long-term contracts is a direct consequence of, among other things, the increased market concentration and unlawful monopoly power achieved by Stericycle's 1999 Acquisition of BFI's entire medical waste business.

33.     The 1999 Acquisition also enabled Stericycle to impose price increases on its large quantity generator accounts in California.  Unrestrained by competition from BFI or any other competitor, Stericycle exploited its monopoly power and its stranglehold over medical waste

treatment facilities to embark on a nationwide campaign, known as the "Dirty Dozen" program, to systematically increase the prices charged to large quantity generator customers. Stericycle also reduced the services provided to large quantity generators to restrict output and increase its own profits.

34.     The increased market concentration afforded by the 1999 Acquisition also allowed Stericycle, using its unlawfully acquired and maintained monopoly power, to punish third-party haulers competing with Stericycle for the transport of medical waste in California. For instance, Integrated Waste Control received a 15% increase on August 31, 2000; Medwaste Disposal received a 17% price increase for certain medical waste on March 1, 2001; North State Specialty received a 15% increase per container for treatment services on March 1, 2001, and; Monterey Bay Medical Waste received a 10% increase per pound on October 1, 2001. The dramatic market concentration that occurred as a result of the 1999 Acquisition – *i.e.*, Stericycle's emergence as the "only company offering medical waste services nationally" – thus restricted third-party haulers' efforts to compete with Stericycle in the Relevant Geographic Market.

**Government Investigations of Stericycle's Anti-Competitive Activity**

35.     Stericycle's acquisition activities and anticompetitive conduct have attracted the interest of federal and state regulators. For example, the Arizona Attorney General alleged that Stericycle traded territories and customer information with BFI in order to achieve a monopoly over Medical Waste Services in Arizona. On August 14, 2002, Stericycle agreed to settle antitrust charges by the Arizona Attorney General, and to pay $320,000 in civil penalties and costs. Stericycle further agreed to provide up to 50,000 pounds per month of incineration treatment services for third-party haulers at its Arizona facility, and was required to issue 25 percent rebates

for the next two years to certain companies that had previously been excluded by Stericycle's anticompetitive practices.

36.     On January 13, 2003, Stericycle and BFI agreed to settle antitrust charges, similar to those alleged herein, by the Utah Attorney General, and to pay a civil penalty of $580,000, $150,000 in costs and an additional $100,000 contribution to a fund to increase competition in the Medical Waste Services industry.  The Utah Attorney General had alleged that Stericycle traded territories and customer information with BFI in order to achieve a monopoly over Medical Waste Services in Arizona.  Stericycle agreed to change its anticompetitive practices, by limiting its use of long-term contracts, eliminating exclusive disposal contracts, and opening up its Utah incinerator to previously restricted third-party haulers.

**Other Anticompetitive Activity**

37.     Stericycle has pursued a strategy of monopolizing the Medical Waste Services market by locking in hospitals to long-term contracts with liquidated damages provisions.  Hospitals generate about 74 percent of the health care industry's waste, and the hospital industry has seen a sharp trend in consolidation.

38.     Disposal of medical waste through waste haulers such as Stericycle may cost hospitals as much as $0.35 cents per pound - significantly more than the cost of installing onsite - autoclave technologies for larger hospitals.  However, the cost of building and maintaining an autoclave, and training and paying staff, constitutes a high barrier to entry, even for a large hospital, and all the more so for smaller entities.  According to the California Department of Health and Human Services, there are only nine operating offsite autoclaves in California; Stericycle owns four of them.

39.     Stericycle's monopoly has not come about because of superior products, service or business acumen, but as a result of its acquisition strategy and price-gouging on incinerator fees to competing haulers.   Customers have consistently complained about Stericycle's performance, reporting that collection trucks have been consistently late, as well as concerns with safety, sloppiness, and billing inconsistencies and errors.   Stericycle's California operations are rated "unsatisfactory" by the Better Business Bureau, because of a failure to respond to customer complaints.

**Stericycle Consolidates Its Monopoly in the California Medical Waste Services Market**

40.     Prior to December 1, 2001, Stericycle was one of two companies operating an incinerator serving the market for Medical Waste Services in California.   On or about that date, Stericycle acquired all of the assets of IES, a subsidiary of Norcal Waste Systems Inc.  The terms of the deal were not disclosed.   IES had operated a medical waste incinerator in Oakland, California, and was in direct competition with Stericycle in the market for Medical Waste Services.   Stericycle obtained IES's entire customer list, including the University of California-San Francisco ("UCSF"), hospitals and biotech firms.   Stericycle shut down the incinerator just nine days later, and laid off IES's entire full-time workforce, numbering 70 employees.

41.     IES's medical waste incinerator was considered state-of-the-art after a $5 million refurbishment in 1996.  The incinerator met the most achievable control technology (MACT) for medical waste incinerators prescribed by the U.S. Environmental Protection Agency.  But Stericycle nevertheless immediately shut down the incinerator, despite the fact that Stericycle neither owned nor operated any incinerators in California, and California is the number-two producer of Medical Waste in the United States.  The Oakland incinerator was the last operating incinerator in California.

42.     With its acquisition of IES, Stericycle captured 95 percent of the market for Medical Waste Services in California. All of Stericycle's competitors in the Relevant Geographic Market are small, regional providers.

43.     Having achieved almost a 100 percent market share over Medical Waste Services in California, Stericycle immediately took steps to capitalize on its monopoly, by increasing hauling and treatment fees dramatically. For example, UCSF reported that Stericycle demanded a price increase of almost 300 percent for incineration services in its first contract negotiation after taking over IES, UCSF's previous Medical Waste Services provider. The increases were even higher for others: IES had charged about $0.18 cents per pound of Medical Waste for hauling and incineration; Stericycle charged between $0.45 cents and $1.00 per pound, depending on volume and length of contract.

44.     In addition to raising its prices, Stericycle has instituted a change in pricing structure, forcing customers to accept a more costly "per container" rather than a "per pound" rate, which requires customers to pay to dispose of partially empty containers. Stericycle typically institutes this change after it has acquired a new company.

45.     Stericycle subsequently informed its customers and haulers that medical waste would be hauled to Stericycle's incinerator in Utah because there was no longer an incinerator operating in California.

46.     In addition to increasing its prices, Stericycle exploited its monopoly and further injured consumers by instituting a reduction in services. For example, UCSF immediately experienced significant delays in Stericycle's pickup services and complained that Stericycle would not honor pickup times that it had previously set with local government in order to minimize disruption in the densely settled residential neighborhood where the UCSF facilities are located.

47.     In addition to achieving a monopoly over medical waste incineration, Stericycle is monopolizing the market for medical waste hauling by charging prohibitive incineration fees that are more than the amount Stericycle charges for its own hauling and incineration services combined. Moreover, by closing all incinerators in California, Stericycle has made the cost of hauling more expensive because competing haulers trust now travel to Utah with medical waste.  Stericycle has succeeded in putting competing haulers out of business, thus further monopolizing the market.

48.     Stericycle has also exploited its size to make it impossible for competitors to offer service to customers.  For instance, Stericycle forbids its customers to split their business between Stericycle and a competitor.  This constitutes an additional barrier to entry, in that small companies cannot find business in a consolidating market of large hospitals and other entities, with which Stericycle has entered long-term exclusive contracts.  The same holds true for non-incinerator alternative treatments: while the barriers to entry for the building and maintenance of an autoclave for steam sterilization are lower than that for an incinerator, Stericycle's long-term contracts and exclusivity provisions make it virtually impossible for competitors to land these large clients.  Large accounts such as hospitals constitute about 42 percent of Stericycle's revenue, and Stericycle controls about 95 percent of the large-generator waste sent to a commercial facility.

49.     It is clear that Stericycle's monopolistic activities are the result of an intentional anticompetitive corporate strategy.  Stericycle's CFO admits that the fact that it has fewer rivals means a "change in competitive dynamics" allowing it to increase its prices toward a 20 percent gross margin.  California officials have remarked to Barron's magazine that Stericycle has an established practice of introducing dramatic price hikes after it acquires its competitors.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action on behalf of itself and the following Class of direct purchasers:

> All persons and entities in the United States (including the District of Columbia and Puerto Rico) who, at any time from four years prior to the filing of this complaint to the present, paid Defendant Stericycle for the collection, transport and/or lawful disposal of medical waste products in the state of California. Excluded from the Class are governmental entities, and Defendant and its subsidiaries and affiliates.

51.    The Class is so numerous that joinder of all members is impracticable. While the exact size of the Class is unknown to Plaintiff at the present time, the members of the Class are believed to number in the thousands.

52.    Common questions of law and fact exist as to all members of the Class. Among these questions are the following:

(a)    whether Defendant unlawfully monopolized the market for Medical Waste Services in California;

(b)    whether Defendant's unlawful conduct caused Plaintiff and the Class to pay more for Medical Waste Services than they otherwise would have paid;

(c)    whether Defendant has monopoly power in California for purposes of Plaintiff's monopolization claims;

(d)    whether Stericycle's acquisition of BFI in November 1999 and IES in December 2001 had the effect of substantially lessening competition and/or tended to create a monopoly in California;

(e)    whether Defendant unjustly enriched itself to the detriment of purchasers of Medical Waste Services, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived therefrom;

- 14 -

      (f)     the appropriate measure of damages incurred by Plaintiff and the Class; and

      (g)     whether Plaintiff and the Class are entitled to injunctive and other equitable relief.

53.     These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting only individual members.

54.     Plaintiff's claims are typical of the Class because Plaintiff and all members of the Class were injured, and continue to be injured in the same manner by Defendant's unlawful, anti-competitive and inequitable methods, acts and practices, and wrongful conduct in acts complained of herein, *i.e.*, they have paid supracompetitive and artificially high prices for Medical Waste Services, and will continue to be forced to do so until the market is competitive and prices reach competitive levels.

55.     Plaintiffs will fairly and adequately protect the interests of all the members of the Class. Plaintiff has retained counsel who are experienced in class action and antitrust litigation, and Plaintiff has no interest in this litigation that is adverse to or in conflict with the interests of the other members of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims, which would otherwise be too small to support the expense of individual, complex litigation. Defendant has acted or has refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
### (Monopolization and Attempted Monopolization in
### Violation of Section 2 of the Sherman Act)

57.     Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

58.     Beginning in June 1995, and continuing until the present, Defendant has engaged in exclusionary, anticompetitive conduct designed to monopolize the market for Medical Waste Services in California.

59.     These acts and practices excluded competing Medical Waste Services companies from a substantial share of the California market for Medical Waste Services, resulting in de facto monopoly power for Stericycle.

60.     From June 1995, to the present, Stericycle acted with an intent to monopolize, and to exclude competition, in the market for Medical Waste Services in California, in violation of Section 2 of the Sherman Act, 15 U.S.C.  §2.  In this regard, Stericycle charged customers supracompetitive prices for inferior service, terminated contracts with certain third-party haulers for incineration services, charged prohibitive fees, entered long-term exclusive contracts with many of its customers, and erected other barriers to competition.

61.     The acts alleged herein were intended to, and did, enable Stericycle to obtain and maintain monopoly power in the market for Medical Waste Services in California, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.  Indeed, at least as early as its acquisition of BFI's medical waste business in California in November 1999, Stericycle possessed a monopoly in the market for Medical Waste Services.

62.     Defendant Stericycle willfully acquired and maintained its monopoly power, including the power to control prices and to exclude competition, in the market for Medical Waste

Services in the Relevant Product Market, and not as a consequence of a superior product or business acumen.

63.     Defendant's monopolistic behavior is causally related to the antitrust injury resulting to Plaintiff and the Class, described herein.

64.     In the alternative, at the time Stericycle engaged in these acts, there was a dangerous probability of Stericycle obtaining monopoly power in the market for Medical Waste Services in California, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

**COUNT II**
**(Unlawful Merger, Stock Acquisition and/or Asset Acquisition**
**in Violation of Section 7 of the Clayton Act)**

65.     Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

66.     Prior to the Class Period, Stericycle operated in a competitive market for Medical Waste Services in California.

67.     On November 1, 1999, Stericycle bought out BFI's Medical Waste Services operations in California, removing its only sizable competitor in the Relevant Geographic Market, and its only competitor with a nationwide presence.

68.     On December 1, 2001, Stericycle bought out IES's Medical Waste Services business in California, thus removing its only competitor who operated an incinerator serving the Relevant Geographic Market.

69.     Since taking over BE and IES, Stericycle has raised prices to supracompetitive levels, and reduced the level of service offered to its customers, and to former customers of BFI and TES.

70.     The effect of Stericycle's acquisition of IES was to substantially lessen competition, and/or to tend to create a monopoly in California for Medical Waste Services, in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

**COUNT III**
**(Unfair Competition in Violation of California Business**
**& Professions Code Sections 17200, *Et Seq.*)**

71.     Plaintiff incorporates by reference all of the allegations in this complaint as if set forth fully herein.

72.     Defendant's intentional conduct in buying out competitors, dominating the market for Medical Waste Services, raising prices to supracompetitive levels at the expense of Plaintiff and the Class, entering long-term contracts with a large portion of the market in order to forestall competition, and other actions alleged herein, constitutes unfair competition and unlawful and unfair business acts and practices within the meaning of California Business and Professions Code §§17200, *et seq.*

73.     As a result of Defendant's violation of California Business and Professions Code §§17200, *et seq.*, Defendant has unjustly enriched itself at the expense of Plaintiff and the Class and will continue to do so.  Defendant's unjust enrichment continues to accrue as it continues to engage in its unlawful business and unfair acts and practices.  The illegal conduct alleged herein is continuing, and there is no indication that Defendant will not continue such activity in the future.

74.     Plaintiff and the Class are each entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, benefits which may have been obtained by Defendants as a result of its unlawful business acts and/or practices.

75.     Thus Plaintiff, on behalf of all others similarly situated, requests that a judicial determination and declaration be made of the rights of Plaintiff and the Class members, and the

corresponding responsibilities of Defendant regarding Medical Waste Services, and that Defendant be declared to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication, designed to give immediate notification to Class members about their rights.

**COUNT IV**
**(For Restitution, Disgorgement and Constructive Trust for**
**Unjust Enrichment by Defendant Stericycle)**

76.     Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

77.     Defendant has benefited from unlawfully obtained profits for Medical Waste Services, resulting from the unlawful and inequitable acts alleged in this Complaint.

78.     Defendant's financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Medical Waste Services by Plaintiff and the Class.

79.     Plaintiff and the Class have conferred upon Defendant an economic benefit, in the nature of the profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

80.     Defendant has been unjustly enriched by its unlawful and inequitable conduct, in violation of the common law of the state of California.

81.     Defendant had knowledge of the benefit it was receiving as a result of its unlawful and inequitable conduct.

82.     The economic benefit of overcharges and unlawful monopoly profits derived by Defendant through charging supra-competitive and artificially inflated prices for Medical Waste Services is a direct and proximate result of Defendant's unlawful practices.

83.     The financial benefits derived by Defendant by reason of its unlawful conduct rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anti-competitive and monopolistic prices during the Class Period, inuring to the benefit of Defendant.

84.     It would be inequitable for the Defendant to be permitted to retain any of the overcharges for Medical Waste Services derived from its unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

85.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by it.

86.     A constructive trust should be imposed upon all sums unlawfully or inequitably received by Defendant traceable to Plaintiff and the Class.

87.     Plaintiff and the Class have no adequate remedy at law.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff on behalf of itself and all others similarly situated respectfully requests a judgment as follows:

A.      Certifying a Class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as the representative of the Class, and designating its counsel as counsel for the Class;

B.      Declaring that Defendant has committed the violations alleged herein;

C.      Awarding Plaintiff and the Class damages against Defendant in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.      Awarding Plaintiff and the Class damages against Defendant pursuant to California Business and Professions Code §§17200, *et seq.*;

E.      In the alternative, awarding Plaintiff and the Class damages representing the amount that Defendant has been unjustly enriched by the behavior alleged herein;

F.      Awarding Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

G.      Awarding Plaintiff and the Class pre judgment and post judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent proved by law;

H.      Permanently enjoining all continuing and future unlawful activity by Defendant in violation of the antitrust laws; and

I.      Awarding Plaintiff and the Class such additional relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands a trial jury on all claims so triable.

DATED:  October 29, 2004

ATKIN & SHIELDS, P.C.
JOANN SHIELDS
BLAKE ATKIN

_____
JOANN SHIELDS

136 South Main Street, Sixth Floor
Salt Lake City, UT  84101
Telephone:  801/533-0300
801/533-0380 (fax)

Liaison Counsel

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
BONNY E. SWEENEY
CHRISTOPHER M. BURKE
WILLIAM J. DOYLE II
HELEN I. ZELDES
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

GOODKIND LABATON RUDOFF
  & SUCHAROW LLP
BERNARD PERSKY
CRAIG BRISKIN
100 Park Avenue, 12th Floor
New York, NY  10017-5563
Telephone:  212/907-0700
212/818-0477 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW N. FRIEDMAN
FRANCIS J. BALINT, JR.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

Co-Lead Counsel for Plaintiffs

SCOTT + SCOTT, LLC
DAVID R. SCOTT
108 Norwich Avenue
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

SCOTT + SCOTT, LLC
EDMUND W, SEARBY III
33 River Street
Chagrin Falls, OH  44022
Telephone:  440/247-8200
440/247-8275 (fax)

DYER & SHUMAN, LLP
KIP B. SHUMAN
801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003
303/830-6920 (fax)

SHOCKMAN LAW OFFICE, P.C.
ROSEMARY J. SHOCKMAN
8170 North 86th Place, Suite 102
Scottsdale, AZ  85258
Telephone:  480/596-1986
480/596-2689 (fax)

LAW OFFICES OF NICHOLAS
   KOLUNCICH III
NICHOLAS KOLUNCICH III
6804 Fourth Street, N.E.
Albuquerque, NM  87107
Telephone:  505/345-0605
505/345-3925 (fax)

Attorneys for Plaintiffs

S:\CasesSD\Medical Waste\Shared_Counsel\Cpt Amd Class Action_Stoll.doc

<u>CERTIFICATE OF SERVICE</u>

This is to certify that copies of the foregoing AMENDED CONSOLIDATED CLASS

ACTION COMPLAINT were mailed first-class postage prepaid this 29TH day of October 2004.

James S. Jardine, Esq.
Allan T. Brinkerhoff, Esq.
N. Aaron Murdock, Esq.
RAY QUINNEY & NEBEKER
P.O. Box 45385
36 South State, No. 1400
Salt Lake City, UT 84145-0385

Douglas Northrup
Jordan Greenland, Esq.
Timothy Burke, Esq.
FENNEMORE CRAIG
3003 North Central Avenue
Suite 2600
Phoenix, AZ  85012

Raymond J. Etcheverry, Esq.
Mark A. Glick, Esq.
Lara A. Reymann, Esq.
PARSONS BEHLE & LATIMER
201 South Main Street, No. 1800
P.O. Box 45898
Salt Lake City, UT 84145-0898

Bonny E. Sweeney
William J. Doyle II
Christopher M. Burke
Helen Zeldes
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
401 B Street, Suite 1700
San Diego, CA  92101

Bernard Persky
Vaishali Shetty
Craig Briskin
GOODKIND LABATON RUDOFF
& SUCHAROW, LLP
100 Park Avenue, 12th Floor
New York, NY  10017-5563

Andrew N. Friedman
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012

Jack Landskroner
LANDSKRONER - GRIECO, LTD.
1360 West 9th Street, Suite 200
Cleveland, OH  44113

Nicholas E. Chimicles
CHIMICLES & TIKELLIS LLP
One Haverford Center
361 West Lancaster Avenue
Haverford, Pennsylvania  19041

Donald J. Enright
Duvall Foundry
FINKELSTEIN, THOMPSON &
LOUGHRAN BURTON H.
FINKELSTEIN
1050 30th Street,
N.W.Washington, DC  20007

Marvin A. Miller
MILLER FAUCHER AND
CAFFERTY LLP
30 North LaSalle Street, Suite 3200
Chicago, IL  60602

Kip B. Shuman
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO 80218-1417

Nicholas Koluncich III
LAW OFFICES OF NICHOLAS
KOLUNCICH III
6501 Americas Parkway, N.E.1 Park
Square, Suite 620
Albuquerque, NM  87110

Michael S. McCarthy
FAEGRE & BENSON, LLP
1700 Lincoln Street, Suite 3200
Denver, CO 80203-4004

Charles A. Blanchard
Joel W. Nornkin
PERKINS COIE BROWN & BAIN
2901 N. Central Avenue, Suite 2000
P.O. Box 400
Phoenix, AZ 85001-0400

R. Ryan Stoll
SKADDEN, ARPS, SLATE,
MEAGHER & FLORN
333 W. Wacker Drive, Suite 2100
Chicago, IL 60606-1285

James C. Krause
KRAUSE & KALFAYAN
1010 Second Avenue, Suite 1750
San Diego, CA  92101

Richard A. Speirs
Robert S. Schachter
ZWERLING, SCHACHTER &
ZWERLING, LLP
767 Third Avenue
New York, NY  10017-2023

Rosemary J. Shockman
SHOCKMAN LAW OFFICE, P.C.
8170 North 86th Place, Suite 102
Scottsdale, AZ  85258

David R. Scott
SCOTT & SCOTT, LLC
108 Norwich Avenue
Colchester, CT 06415

Michael J. McCarthy
LAW OFFICES OF MICHAEL J.
MCCARTHY
P.O. Box 900
Hotchkiss, CO 81419

Sheila L. Birnbaum
SKADDEN, ARPS, SLATE,
MEAGHER & FLORN
Four Times Square
New York, NY 10036

Andrew H. Stone
John A. Pearce
JONES WALDO HOLBROOK &
MCDONOUGH, P.C.
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101

James W. Howard
LAW OFFICES OF JAMES W. HOWARD
2425 E. Camelback Road, Suite 950
Phoenix, AZ 85015

Edmund W. Searby III
SCOTT & SCOTT
33 River Street
Chagrin Falls, OH 44022